1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
7                                    AT SEATTLE

8    RICHARD H. WARREN,

9                          Plaintiff,              CASE NO. 2:19-cv-01413-RSL-BAT

10          v.                                     **REPORT AND**
                                                   **RECOMMENDATION**
11   ADELAIDE O HORNE, et al.,

12                         Defendants.

13          Plaintiff, Richard H. Warren, proceeds pro se in this civil rights action pursuant to 42

14   U.S.C. § 1983. Dkt. 9. Mr. Warren is a prisoner currently housed at the Coyote Ridge

15   Corrections Center (CRCC) in Connell, Washington. *Id.* He brings claims against Department of

16   Corrections (DOC) employees defendants Adelaide O. Horne (Health Services Provider, Monroe

17   Correctional Complex, Twin Rivers Unit (MCC-TRU)), Belinda Stewart (Corrections Program

18   Administrator (CPA)-Religious Program Manager at DOC headquarters)[1], Michael S. Hathaway

19   (CPM at MCC-TRU), Mary A. Gumbo (Health Service Provider, MCC-TRU), Jeffrey E. Flick

20   (Correctional Unit Supervisor (CUS), MCC-TRU), Steven M. Sager (Counselor, MCC-TRU),

21

22

23
_____
[1] Defendants indicate that CPA Stewart is no longer the Religious Program Manager at DOC headquarters (or a
DOC employee) although it is unclear from the record when she stopped serving in that position. Dkt. 37, at 8.

REPORT AND RECOMMENDATION - 1

1  and Sarah E. Landis (Health Service Provider, CRCC). *Id.* Mr. Warren brings claims against the

2  defendants in their individual and official capacities. *Id.*

3      Mr. Warren alleges that the defendants violated his rights by transferring him from MCC-

4  TRU to CRCC in June 2019. *Id.* He claims he had previously been transferred to MCC-TRU

5  from CRCC in November 2017 in order to better accommodate his religious practice of

6  Orthodox Judaism. *Id.* He also claims that at the time of his transfer in June 2019 he was

7  undergoing treatment at MCC-TRU for a serious back injury which he incurred while working as

8  a porter at MCC-TRU. *Id.* Mr. Warren alleges that the defendants conspired to violate his rights

9  to the "Free Exercise of Religion, Equal Protection, 1st/2nd Amendment, Adequate Medical Care,

10  [and] Freedom from Retaliation." *Id.* Mr. Warren seeks damages and injunctive relief including

11  an order requiring DOC "to initiate and pay for plaintiff's neurological and spinal surgical

12  repair" and "to initiate establishment and accommodative out of cell chapel location for plaintiff

13  to conduct unsponsored orthodox Judaism Jewish religious Shabbos Eve/Jewish High Holiday

14  services at all [DOC] Facilities state wide." *Id.*

15      Defendants now move for summary judgment and dismissal of all of Mr. Warren's

16  claims. Dkt. 37. Mr. Warren opposes the motion. Dkts. 43, 44. The undersigned recommends

17  that defendants' motion for summary judgment (Dkt. 37) be GRANTED and that Mr. Warren's

18  federal claims be DISMISSED WITH PREJUDICE as described below. The undersigned further

19  recommends that the Court decline to exercise supplemental jurisdiction over Mr. Warren's state

20  law claims and that those claims be DISMISSED WITHOUT PREJUDICE.

21                **REQUESTS TO STRIKE AND ADMISSIBILITY OF EVIDENCE**

22      In his response to defendants' motion for summary judgment, Mr. Warren asks the Court

23  to strike the declaration of Kenneth D. Sawyer, M.D, submitted in support of defendants' motion

on the grounds that Dr. Sawyer is not a named defendant, is not a neurosurgeon, and because he did not personally examine Mr. Warren. Dkts. 43, 44. Mr. Warren cites no authority to support his request to strike Dr. Sawyer's declaration. While Dr. Sawyer did not personally examine Mr. Warren, he did review his medical records and acted as an orthopedic consultant with respect to Mr. Warren's back injury. Dkt. 38. Mr. Warren does not substantially challenge Dr. Sawyer's summary of Mr. Warren's medical records and treatment or his qualifications as an orthopedic specialist. Absent any more specific objection, it appears to the Court that Dr. Sawyer, as an orthopedic specialist and surgeon, is qualified to provide an expert medical opinion on the care provided to Mr. Warren related to his back injury. *See* Dkt. 38; Fed. R. Evid. 702-705. Under these circumstances, the Court sees no basis to strike Dr. Sawyer's declaration and has considered it in issuing its recommendation on defendants' motion.

Defendant's reply papers contain numerous evidentiary objections to the exhibits submitted with Mr. Warren's response to defendants' motion for summary judgment. Dkts. 43, 44, 47. The Court notes that, "to survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (citing *Block v. City of L.A.,* 253 F.3d 410, 418–19 (9th Cir. 2001)). This means that, when evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence. *Id.*, at 1037 (considering evidence from a diary, notwithstanding the defendant's hearsay objections, in the context of a motion for summary judgment because the contents of the diary were "mere recitations of events within the [plaintiff/appellant's] personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a

1    variety of ways"); *see Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1120 (E.D.

2    Cal. 2006).

3         The Court recognizes that some of the evidence Mr. Warren submits with his response

4    may be vulnerable to objection the on grounds that it lacks relevance or has not been properly

5    authenticated. However, given the general deficiencies in Mr. Warren's claims, much of this

6    evidence submitted with his opposition papers is largely irrelevant, immaterial, and unnecessary

7    to the ultimate disposition of his claims. In fact, the Court makes only very limited reference to

8    any of these documents in making its recommendations on Mr. Warren's claims and does not

9    rely on any inadmissible evidence for substantive purposes. The Court therefore declines to

10   undertake the labor-intensive task of identifying and striking all objectionable content submitted

11   with Mr. Warren's opposition papers. *See Wright v. Washington*, No. C18-0927-RAJ-MAT,

12   2020 WL 3105723, at *12 (W.D. Wash. Mar. 10, 2020), *report and recommendation adopted*,

13   No. 18-CV-00927-RAJ, 2020 WL 3103893 (W.D. Wash. June 11, 2020) (declining to undertake

14   the labor-intensive task of identifying and striking all objectionable content on the grounds that

15   the declarations submitted by plaintiff were largely irrelevant and unnecessary to the ultimate

16   disposition of the claims and the Court did not rely on inadmissible evidence for substantive

17   purposes in deciding those claims); *see also Smith v. Cty. of Humboldt*, 240 F. Supp. 2d 1109,

18   1115–16 (N.D. Cal. 2003) (declining to rule specifically on defendants' numerous evidentiary

19   objections because, even considering the evidence submitted by plaintiff, plaintiff failed to state

20   a colorable claim and defendants were entitled to summary judgment).[2]

21                           **Summary of Plaintiff's Allegations**

22

23   _____

[2] The Court notes that Mr. Warren also submitted numerous documents after his complaint had been served which appear to be intended as exhibits to his amended complaint. *See* Dkts. 16, 17, 27, 32, 34, 35, 26, 42, 45. Defendants did not specifically move to strike these exhibits and the Court has considered them to the extent relevant and appropriate in issuing its recommendation on defendants' motion.

**A.      Retaliation**

In his sworn amended complaint, Mr. Warren alleges that on November 13, 2017, Belinda Stewart, DOC Headquarters Religious Program Manager, "entered into a mutual agreement with the plaintiff regarding a priority HQ (religious transfer) to Monroe Corrections, for active religious programming in the Monroe Orthodox Judaism religious service program." Dkt. 9. Mr. Warren alleges that on June 10, 2019, defendants Stewart, Flick, Sager, and Hathaway "breached the transfer agreement between DOC HQ and the plaintiff and transferred the plaintiff back to Coyote Ridge Corrections." *Id.* Mr. Warren appears to allege that defendants transferred him in retaliation for his refusal to participate in programming other than religious programming, namely the Sex Offender Treatment and Assessment (SOTAP) program, at MCC-TRU. *Id.* He claims the "retaliatory transfer to Coyote Ridge Corrections based on bed space and programming did not advance legitimate penological goals and or standards governmentally, such as preserving institutional order and or discipline." *Id.*

**B.      Free Exercise of Religion**

Mr. Warren further alleges defendants Stewart, Flick, Sager, and Hathaway violated his right to the free exercise of religion. *Id.* He claims by transferring him to CRCC these defendants substantially burdened his ability to adhere to Jewish law and practice his faith. *Id.* He claims at CRCC he is not permitted to exercise his religion "in any form out of four man cell accommodation in a religiously required and or appropriately Orthodox Judaism setting of ritual custom and worship[.]" *Id.* He alleges CRCC "continues to refuse and or deny re-institution of Judaism religious service accommodation under unsponsored condition[.]" *Id.* Mr. Warren notes that "Jewish law mandates restricted travel Friday evening ongoing until Saturday evening, a 24 hour period, thus there can be no Jewish sponsor under this time frame." *Id.*

1    **C.    Medical Care**

2        Mr. Warren claims defendants Horne, Gumbo, and Landis failed to provide him with

3    adequate medical care. *Id.* He alleges defendants "denied, interrupted, interfered and or delayed;

4    care, physical therapy, CRC consult, screenings, and surgical repair." *Id.* He alleges "the

5    defendants also denied medically prescribed neuropain medications specifically engineered to

6    combat nerve damage, and or temporarily relieve neurological side effects." *Id.* He claims the

7    defendants "failed to set forth adequate medical care, competent care, protective oversight, and

8    compassion by conspiring and permitting a retaliatory transfer of a seriously injured prisoner[.]"

9    *Id.* He claims defendants' actions constituted cruel and unusual punishment, deliberate

10    indifference, and medical malpractice. *Id.*

11        Specifically, with respect to defendants Horne and Gumbo, Mr. Warren alleges

12    defendants acted with deliberate indifference to his serious medical need when they "refused

13    [him] sickcall care, on 3-12-2019, failed to report a work place injury to labor and industries on

14    2-20-2019, failed to establish a medical transfer hold blocking the 6-10-2019 transfer to CRCC

15    until surgical repair was completed … and permitting DOC custody personal [sic] to dictate

16    medical decisions regarding plaintiff's health and welfare[.]" *Id.* Mr. Warren claims defendants

17    actions resulted in substantial interruption and delay of treatment. *Id.*

18        Specifically, with respect to defendant Landis, Mr. Warren alleges defendant acted with

19    deliberate indifference to his serious medical need when she "refused plaintiff care on 7-17-

20    2019, failed to report a work place injury to labor and industries on 7-17-2019, failed to establish

21    a medical transfer hold blocking the 6-10-2019 transfer to CRCC until surgical repair was

22    completed … and permitting DOC custody personal [sic] to dictate medical decisions regarding

23

plaintiff's health and welfare[.]" *Id.* Mr. Warren claims defendants actions resulted in substantial

interruption and delay of treatment. *Id.*

**D.    Equal Protection**

Mr. Warren claims defendants Horne, Gumbo, and Landis also violated his rights to

equal protection. *Id.* Mr. Warren claims defendants discriminated against him with regards to his

serious medical needs. *Id.* He claims DOC medical personnel "put medical holds on inmates

requiring medical care and or dental care which prohibits transfer to camps, work release and

other prisons" and "normally report all DOC workplace injuries of a prisoner under its care to

labor and industries." *Id.*

Mr. Warren claims defendants Stewart, Flick, Sager, and Hathaway violated his right to

equal protection by affording other religious groups and ethnicities similarly situated, including

catholic, Muslim, Messianic, Christian prisoners "differential accommodation" and implemented

"opposite standard for the plaintiff for the intentional purposeful discrimination of a Jewish

prisoner[.]" *Id.*

**E.    Conspiracy**

Mr. Warren also alleges all defendants "conspired" to "prevent plaintiff from acquiring

religious free[dom] and adequate medical care."

**F.    Allegations in Original Complaint and in Response to Motion for Summary**

**Judgment**

Mr. Warren appears to attempt to incorporate by reference a litany of violations from his

original complaint. Specifically, he references the following:

> cruel and unusal punishment, irreparable harm, systemic cruelty, display
> of unnecessary wanton infliction of pain, failure to report L+I work
> injury, medical failure to protect, medical deliberate indifference,
> conspiracy, medical malpractice, medical incompetence, willful
> endangerment, hate crime, willful disregard for human life, negligence,

REPORT AND RECOMMENDATION - 7

1
2
3
4
5
6
7

equal protections violations, religious discrimination, religious deliberate
indifference, medical habitual carelessness, interfering with seriously
needed medical care, treatment and therapy, causing imminent danger of
serious physical injury, conspiracy to deny freedom of religion,
conspiracy to deny adequate medical care, conspiracy to deny due
process under DOC grievance program, abuse, coercion, obstruction of
medical care, obstruction of religious exercise, conspiracy to commit 1
and 2 degree assault and battery, wilfull intent to cause harm, ill-intent,
wreckless endangerement, medical compassion fatigue, anti-semitism,
retaliation, violation of medical code of ethics, property damage and loss
denial of sick-call, medical care, retaliatory transfer, denying my rights
to access life and limb saving treatments and therapies, denying this
prisoner life, limb, liberty in the pursuit of happiness, and violated my
freedom of speech right.

8   Dkt. 5, at 7.

9         The Court notes that an amended complaint operates as a complete replacement for the

10  original complaint and a cause of action alleged in the original complaint that is not alleged in

11  the amended complaint is waived. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir.

12  1997), *overruled in part on other grounds*, *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir.

13  2012). Moreover, there is no basis in fact or law – either in Mr. Warren's allegations or based on

14  the summary judgment evidence before the Court – to entertain all these alleged violations.

15  Finally, as noted below, even if all of these allegations were properly before the Court, the Court

16  has addressed all of Mr. Warren's federal claims and, as discussed below, his attendant state law

17  claims should be dismissed without prejudice in light of the recommended dismissal of the

18  federal claims.

19        The Court also notes that Mr. Warren appears to attempt to raise additional claims,

20  including a claim under the Americans with Disabilities Act (ADA), in his response to the

21  defendants' motion for summary judgment. Dkts. 43, 44. This claim is not raised in Mr.

22  Warren's amended complaint, nor has he moved to amend his complaint to include this claim.

23  As such, this claim, and any other claims he attempts to raise for the first time in his response to

defendants' motion for summary judgment, are not properly before the Court and will not be

REPORT AND RECOMMENDATION - 8

considered or addressed further herein. *See, e.g., Hardy v. 3 Unknown Agents*, 690 F. Supp. 2d 1074, 1084 (C.D. Cal. 2010) ("In general, the Court will not consider a new claim raised for the first time in response to a motion for summary judgment." (*citing Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1292–93 (9th Cir. 2000)).

## STATEMENT OF RELEVANT FACT

**A.    Medical Treatment at MCC and CRCC**

In support of their motion for summary judgment, defendants submit the declaration of Kenneth D. Sawyer, M.D., an orthopedic specialist for DOC who provides orthopedic consultation to various DOC providers and participates as a member on the Care Review Committee (CRC). Dkt. 38. Dr. Sawyer states he is familiar with the healthcare provided to Mr. Warren related to his complaints of back pain from his review of Mr. Warren's official DOC medical file as well as his own personal involvement in Mr. Warren's care. *Id.*

According to Dr. Sawyer, Mr. Warren first presented to DOC health care providers at MCC-TRU with back problems on February 20, 2019. *Id.* He was seen by a Registered Nurse (RN) and complained of lower back pain and numbness in his right leg. *Id.* Mr. Warren told the RN that his pain was 10 out of 10 and that he would like something for the pain. *Id.* Mr. Warren was referred to Advanced Registered Nurse Practitioner (ARNP) Mary Gumbo who examined him on the same date. *Id.* Mr. Warren told ARNP Gumbo that his pain was 6-9 out of 10 and that he believed he must have injured himself pushing or pulling trash cans while working his prison porter job. *Id.* ARNP Gumbo excused Mr. Warren from working for one day, provided him Ibuprofen for his pain, and ordered X-rays of his lower back which were performed at MCC-TRU on February 22, 2019. *Id.*

Mr. Warren was next seen at MCC-TRU on February 22, 2019, by several MCC-TRU health care providers. *Id.* At this time Mr. Warren again complained of pain in his lower back and right leg. *Id.* On this date Mr. Warren was examined again and was given non-narcotic pain relievers Toradol and Methocarbonol and had blood drawn for lab testing. *Id.* Mr. Warren was also advised to do gentle stretching and to go to sick call again if he wasn't getting better by the following week. *Id.* Mr. Warren was seen again for his back and leg problems on February 25, 2019 by Physician's Assistant Certified (PA-C) Adelaide Horne. *Id.*

PA-C Horne examined Mr. Warren and assessed him as having sciatica on his right side. *Id.* PA-C Horne prescribed pain medications, recommended the use of ice and a cane, and excused Mr. Warren from working for 2 weeks. *Id.* On February 26, 2019, Mr. Warren was seen briefly by PA-C Horne due to a scheduling error. *Id.* At this time Mr. Warren indicated that he was having some improvement of his symptoms and was tolerating the increased dose of methocarbonol well. *Id.*

Mr. Warren was next seen on March 4, 2019, by RN Hodge. *Id.* Mr. Warren again complained of back and leg pain but was in no apparent distress (NAD). *Id.* RN Hodge referred Mr. Warren to his primary care provider, ARNP Gumbo, who saw Mr. Warren on this same date. *Id.* ARNP Gumbo examined Mr. Warren again and advised him to continue his pain medication regimen, including methocarbonol. *Id.*

Mr. Warren was seen briefly by MCC-TRU RN Shaw on March 12, 2019 who advised him to sign up to see his primary health care provider. *Id.* Mr. Warren was seen by PA-C Horne on March 28, 2019 for continued back and leg pain. *Id.* PA-C Horne examined Mr. Warren again and reiterated her assessment that he had sciatica on his right side. *Id.* PA-C Horne also indicated that she would place a consult for magnetic resonance imaging (MRI) of Mr. Warren's lower

1   back/spine to attempt to discover the cause of Mr. Warren's continued back and leg pain. *Id.* Mr.

2   Warren was seen by ARNP Gumbo on May 2, 2019. *Id.* Mr. Warren's complaints of back and

3   leg pain were consistent with his prior complaints. *Id.* Mr. Warren was advised to continue

4   taking pain medications and to report to medical if his pain or mobility got worse. *Id.*

5       On May 10, 2019, PA-C Horne sent a consult email to Dr. Sawyer in which she detailed

6   Mr. Warren's history of back and leg pain and asked him whether an MRI of his lower

7   back/spine was medically warranted. *Id.* Dr. Sawyer responded to the email shortly thereafter

8   indicating that he had reviewed Mr. Warren's February 22, 2019, X-rays and considered them to

9   be normal for a 57-year old person, that he probably had a herniated disc, that at 10 weeks he

10  should be improving but maximum improvement could take a year, that more likely than not he

11  would recover "with conservative management"; and that physical therapy may be helpful. *Id.*

12  Although he did not explicitly say so in his response, Dr. Sawyer clarifies in his declaration that

13  he did not believe that an MRI was needed at that time. *Id.*

14      On May 21, 2019, Facility Medical Director Dr. Arieg Awad sent an email to Dr. Sawyer

15  following up on the May 10, 2019 consult email from PA-C Horne. *Id.* Dr. Awad asked if an

16  MRI was needed even though MCC-TRU was proceeding with a conservative course of

17  treatment for Mr. Warren's back and leg problems. *Id.* Dr. Sawyer responded to this consult

18  email shortly after receiving it indicating that most disc herniations resolve themselves without

19  surgery, that continued conservative treatment for a few more weeks was appropriate, but that if

20  Mr. Warren did not improve in a few more weeks an MRI would be appropriate. *Id.*

21      On May 23, 2019 Mr. Warren was again seen by PA-C Horne. *Id.* Mr. Warren

22  complained of worse pain in his back and legs. *Id.* PA-C Horne indicated she would consult with

23  Dr. Sawyer again about getting an MRI done and that she would consider presenting a request

1    for an MRI to DOC's Care Review Committee (CRC). *Id.* On this same date PA-C Horne sent

2    Dr. Sawyer another consult/request asking for my input on Mr. Warren getting a MRI on his

3    lower back. *Id.* Dr. Sawyer responded to PA-C Horne's consult/request advising her that if Mr.

4    Warren was getting worse after 12 weeks of conservative treatment an MRI would be

5    appropriate. *Id.* On this same date PA-C Horne requested that Dr. Awad approve the MRI. *Id.*

6    Dr. Awad approved the MRI on May 31, 2019. *Id.*

7            On June 13, 2019, before MCC-TRU scheduled Mr. Warren to be transported to an

8    outside medical facility for an MRI, he was transferred to a different DOC facility, the Coyote

9    Ridge Corrections Center (CRCC). *Id.* Dr. Sawyer opines that Mr. Warren's back problems and

10   the care he was receiving at MCC-TRU for those problems did not constitute a valid reason to

11   keep Mr. Warren at MCC-TRU as CRCC was fully capable of providing the care Mr. Warren

12   needed for his back problems. *Id.* Shortly after arriving at CRCC, health care staff from CRCC

13   arranged for Mr. Warren to get his approved MRI which was done on July 3, 2019. *Id.*

14          Mr. Warren's July 3, 2019 MRI showed that Mr. Warren had a mostly normal and

15   healthy lower spine with the exception of a protrusion or herniation of one disc. *Id.* Because of

16   this protrusion, CRCC sent the MRI to a second outside provider, RubiconMD radiology, for

17   their opinion. *Id.* RubiconMD reviewed the July 3, 2019 MRI and recommended that Mr. Warren

18   have a neurosurgical evaluation to determine if back surgery was warranted to relieve his

19   symptoms of nerve impingement. *Id.* DOC approved the neurosurgical evaluation and any

20   treatments recommended as a result of this evaluation on July 30, 2019. *Id.* Mr. Warren had a

21   neurosurgical evaluation done by Chris Heller, M.D., on September 23, 2019 in Spokane,

22   Washington. *Id.* Dr. Heller recommended that Mr. Warren undergo back surgery which could

23   relieve the pain and other symptoms he was experiencing and Mr. Warren agreed to surgery. *Id.*

1    Dr. Heller also indicated that Mr. Warren would need to have cardiac clearance prior to surgery

2    as Mr. Warren had a prior heart issue. *Id.*

3            Mr. Warren was seen and evaluated by an outside cardiologist on November 27, 2019 to

4    get the cardiac clearance requested by Dr. Heller. *Id.* The cardiologist determined that Mr.

5    Warren's prior cardiac problems and his current cardiac condition did not pose any problems for

6    surgery and cleared him for back surgery. *Id.* Dr. Heller performed surgery (a laminectomy and

7    discectomy) on Mr. Warren's lower spine on January 2, 2020, at Deaconess Hospital in Spokane.

8    *Id.* Dr. Sawyer opines that Mr. Warren received appropriate post-operative care and that it

9    appears that the surgery has resulted in a significant reduction of the pain and other symptoms

10   Mr. Warren had been experiencing in his back and legs. *Id.*

11           Dr. Sawyer offers the following opinion regarding Mr. Warren's condition and care:

12           Based on my experience and training as a medical doctor, it is my
             opinion that Mr. Warren received appropriate and timely care for his
13           back and leg problems from February 2019 to the present. Shortly after
             he complained of back and leg pain Mr. Warren's back was X-rayed and
14           these X-rays did not indicate serious problems requiring anything more
             than a conservative, wait-and-see approach as most herniated discs
15           resolve themselves within a few weeks or months. Once this
             conservative approach did not produce the desired results, Mr. Warren
16           was timely given an MRI which was interpreted by two outside
             specialists. One of the specialists recommended a neurological
17           evaluation and that was also timely provided. The Physician who
             conducted the neurological evaluation recommended that Mr. Warren
18           have surgery on his back and that was approved by DOC. While Mr.
             Warren made complaints of pain, DOC's health care providers always
19           offered Mr. Warren pain medications and other aids, such as a cane and
             lay-ins from work. Mr. Warren never had such severe pain that he was
20           unable to perform his activities of daily living, including ambulating,
             personal hygiene, and eating. In fact, Mr. Warren often refused the pain
21           medications offered to him by DOC health care staff. It is noteworthy
             that when Dr. Heller was asked by CRCC medical staff for assistance in
22           arranging the cardiac evaluation and clearance Mr. Warren needed prior
             to surgery, Dr. Heller advised CRCC medical staff scheduling the cardiac
             clearance was not urgent "because the surgery itself was not urgent"
23           even with Mr. Warren's level of "discomfort".
                     In my opinion the care provided to Mr. Warren for his back
             problems by DOC health care staff was clearly consistent with the
             standard of care in the medical community in Washington.

REPORT AND RECOMMENDATION - 13

Defendants also submit the declaration of Sarah Landis, a Physician's Assistant Certified (PA-C) at CRCC, in support of their motion. Dkt. 40. PA-C Landis states that Mr. Warren arrived at CRCC from MCC-TRU on June 13, 2019. *Id.* She states that she was not involved in the decision to transfer Mr. Warren but she is unaware of any medical reason for him not to be transferred as CRCC was able to provide the same quality of medical care to Mr. Warren for his disc issues as MCC. *Id.* She states that on June 18, 2019, Mr. Warren signed up for sick call and was seen by PA-C Shane Ririe. *Id.* Because Mr. Warren did not have an emergent medical need, PA-C Ririe referred Mr. Warren to PA-C Landis as his primary care provider for a follow-up visit on July 10, 2019. *Id.*

Because CRCC healthcare staff were in training on July 10, 2019, the appointment was rescheduled for July 17, 2019. *Id.* PA-C Landis states she met with Mr. Warren on July 17, 2019, and provided some medical care but he refused to allow her to conduct a physical examination because she was female and he wanted the examination done by a male for religious reasons. *Id.* PA-C Landis referred Mr. Warren to a male provider, PA-C Ririe, who saw Mr. Warren the following week and continued the workup started by PA-C Landis on July 17, 2019. *Id.* PA-C Landis states she does not recall providing any further medical care to Mr. Warren after July 17, 2019, once his care was transferred to PA-C Ririe. *Id.* She states that she did not delay or deny any medical care to Mr. Warren and the limited care she did provide was appropriate and consistent with the standard of care in the medical community. *Id.*

**B.    Classification Review and Transfer from MCC to CRCC**

In support of their motion for summary judgment, defendants also submit the declaration of Classification Counselor Steven Sager. Dkt. 39. According to Counselor Sager, in April 2019, MCC- staff began the process of preparing for the May 2019 classification meeting for Mr.

1    Warren. *Id.* Inmates have annual classification reviews which are designed to place or retain

2    inmates in facilities that best suit DOC's safety needs and inmates' needs to participate in work,

3    education, and treatment. *Id.* Inmates' medical and mental health needs are also taken into

4    account in classification recommendations and decisions. *Id.* DOC's classification process is

5    primarily governed by DOC Policy No. 300.380. *Id.*

6        According to Counselor Sager, Mr. Warren has been in DOC custody since March 2004

7    and was housed at the Coyote Ridge Corrections Center (CRCC) from March 31, 2011, to

8    November 9, 2017, when he was transferred to MCC-TRU. *Id.* Mr. Warren was previously

9    incarcerated in DOC facilities from 1989 to 1997. *Id.* He is serving a 280 month sentence for

10   three counts of Second Degree Rape of a Child and one count of First Degree Child Molestation

11   under a King County Superior Court Judgment and Sentence. *Id.* Mr. Warren's current Judgment

12   and Sentence requires him to undergo a sexual deviancy treatment evaluation and to follow all

13   recommendations for sex offender treatment resulting from this evaluation. *Id.* Because of his

14   convictions for child rape and child molestation, Counselor Sager opines it is "highly likely" that

15   Mr. Warren would be found to need sex offender treatment while in DOC custody. *Id.*

16       DOC provides sex offender treatment to inmates in its Sex Offender Treatment and

17   Assessment Program or SOTAP. *Id.* TRU is DOC's primary facility for providing inmates

18   SOTAP but the Airway Heights Corrections Center near Spokane, Washington also provides

19   SOTAP. *Id.* According to Counselor Sager, while MCC-TRU houses many inmates who are not

20   sex offenders and are not required by their Judgments and Sentences to undergo SOTAP, MCC-

21   TRU routinely attempts to move these inmates to other appropriate DOC facilities in order to

22   make space for those inmates who need or are required to undergo SOTAP and are eligible and

23   willing to undergo SOTAP. *Id.* While Mr. Warren is required to participate in sex offender

REPORT AND RECOMMENDATION - 15

1   evaluation and treatment by his Judgment and Sentence, his transfer to MCC-TRU in 2017 was

2   not for purposes of sex offender treatment but was apparently for religious purposes. *Id.* This

3   transfer was directed primarily by former DOC Headquarters Religious Program Manager

4   Belinda Stewart. *Id.* However, Counselor Sager asserts, DOC classification policy 300.380 does

5   not list religious accommodation as one of the factors to be considered when making

6   classification decisions. *Id.*

7        Mr. Warren's annual classification occurred in May 2019. *Id.* Under DOC policy, the

8   classification process is done mostly at the institution level by the Facility Risk Management

9   Team or "FRMT". *Id.* However, the FRMT can only make recommendations on classification

10   and DOC Headquarters makes the final decisions on inmates' classification. *Id.* The FRMT is

11   generally made up of those DOC Staff members most knowledgeable of the inmate's status and

12   needs and usually includes the inmate's counselor, a custody representative such as a

13   Correctional Sergeant, a Correctional Unit Supervisor (CUS), and sometimes a DOC mental

14   health provider. *Id.*

15        In Mr. Warren's case the MCC-TRU FRMT in 2019 consisted of Mr. Warren's

16   counselor, Monqueescha Walker, Counselor Sager as Counselor Walker's supervisor, CUS

17   Flick, mental health counselor Jiminez, and Correctional Sergeant Kantak. *Id.* The FRMT

18   occurred on May 8-9, 2019 and Mr. Warren participated in the FRMT. *Id.* Counselor Sager states

19   that to the best of his recollection Mr. Warren told him prior to his 2019 classification hearing

20   that he would not enter SOTAP. *Id.* Because Mr. Warren continued to refuse to participate in

21   SOTAP at MCC-TRU, counselor Walker, CUS Flick, and Counselor Sager recommended that

22   Mr. Warren be referred to the DOC Headquarters Classification Screening Committee (HCSC)

23

1   for a continued custody assignment of Minimum Custody (MI3) and transfer to another custody

2   appropriate facility. *Id.*

3         Counselor Sager states because he was aware that Mr. Warren had been transferred to

4   MCC-TRU for religious accommodation reasons, several weeks prior to the FRMT in May 2019,

5   he contacted the MCC-TRU chaplain, Chaplain Fischer, to see if there was any religious reason

6   why Mr. Warren needed to remain at MCC-TRU. *Id.* According to Counselor Sager, Chaplain

7   Fisher indicated that while MCC had more Jewish volunteer support and resources for MCC

8   inmates than most other institutions, Mr. Warren could be transferred to another DOC facility

9   and that he would recommend a transfer to either MCC Washington State Reformatory (WSR) or

10  CRCC. *Id.*

11        The FRMT's classification workup and recommendation went to MCC Corrections

12  Program Manager Michael Hathaway who on May 10, 2019, agreed with the recommendations

13  to retain inmate Warren's custody level at MI3 but did not agree to the transfer recommendation

14  and instead recommended that Mr. Warren be retained at MCC-TRU. *Id.* DOC's HCSC makes

15  the final decision on what custody level inmates will have and in which facility they will be

16  housed. *Id.* DOC's HCSC made its decision on May 17, 2019 and decided to maintain Mr.

17  Warren's custody level at MI3 and transfer him to CRCC. *Id.* The HCSC decision stated

18  "Refuses SOTAP, Denies crime". *Id.* The HCSC members who made this decision were DOC

19  employees Kevin Bowen (chair), Casey Kaech, Shelly Hanson, Donald Feist, Charles Korus,

20  Richard Fall, and Kathryn McCann. *Id.*

21        Counselor Sager states that his recommendation that Mr. Warren be transferred was

22  based entirely on his being ineligible for SOTAP due to his denial of his crimes and his refusal to

23  undergo sex offender treatment. *Id.* He states that to the best of his knowledge there is not and

REPORT AND RECOMMENDATION - 17

1  has never been a contract between DOC and Mr. Warren to keep him at MCC-TRU for religious

2  reasons and he has never heard of DOC having such a contract with an inmate. *Id.* He states

3  DOC's classification policies do not mention an inmate's religious needs or religious requests as

4  something that can or should be considered when making classification recommendations or

5  decisions. *Id.* He states to the best of his knowledge all major DOC institutions, including CRCC

6  have chaplains and provide for inmates to exercise their religious beliefs and practices consistent

7  with DOC's safety and security needs. *Id.* He states he was also not aware of any medical reason

8  why Mr. Warren should not be transferred from MCC-TRU to CRCC as all major DOC

9  institutions, including CRCC provide necessary health care to their inmates. *Id.* He states that

10 Mr. Warren's classification and transfer to CRCC were routine and appropriate under DOC

11 classification policy and were done only for legitimate penological reasons. *Id.*

## STANDARD OF REVIEW

13      The Court shall grant summary judgment if the movant shows that there is no genuine

14 dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R.

15 Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the absence

16 of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d

17 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce

18 any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the

19 absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato*

20 *Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). A nonmoving party's failure to comply with local

21 rules in opposing a motion for summary judgment does not relieve the moving party of its

22 affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*,

23 323 F.3d 1178, 1182-83 (9th Cir. 2003).

1     A genuine dispute concerning a material fact is presented when there is sufficient

2  evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty*

3  *Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which is "relevant to an element

4  of a claim or defense and whose existence might affect the outcome of the suit," and the

5  materiality of which is "determined by the substantive law governing the claim." *T.W. Elec.*

6  *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). When the Court

7  considers a motion for summary judgment, "[t]he evidence of the non-movant is to be believed,

8  and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby, Inc.*,

9  477 U.S. at 255.

10     "If the moving party shows the absence of a genuine issue of material fact, the non-

11  moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine

12  issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex*

13  *Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-

14  moving party may not rely upon mere allegations or denials in the pleadings but must set forth

15  specific facts showing that there exists a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*.,

16  477 U.S. at 249. A plaintiff must "produce at least some significant probative evidence tending

17  to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959,

18  963 (9th Cir. 1990). The court must determine whether the specific facts that are presented by the

19  non-moving party, considered along with undisputed context and background facts, would show

20  that a rational or reasonable jury might return a verdict in the non-moving party's favor based on

21  that evidence. *Emeldi v. University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

22     To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) the violation of a right

23  secured by the Constitution and laws of the United States, and (2) the deprivation was committed

by a person acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)); *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir.1988).

## DISCUSSION

**A.     Eighth Amendment – Medical Care**

To establish a constitutional violation under the Eighth Amendment due to inadequate medical care, a plaintiff must show "deliberate indifference" by prison officials to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Estelle*, 429 U.S. at 106. "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104); *see also Jett*, 439 F.3d at 1096; *Clement*, 298 F.3d at 904; *Doty v. Cty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994). The court should consider whether a reasonable doctor would think that the condition is worthy of comment, whether the condition significantly affects the prisoner's daily activities, and whether the condition is chronic and accompanied by substantial pain. *See Lopez v. Smith*, 203 F.3d 122, 1131–32 (9th Cir. 2000); *Doty*, 37 F.3d at 546 n.3 (citing *McGuckin*, 974 F.2d at 1059–60).

Once a serious medical need is shown, the inmate must show the defendant's response to the medical need was "deliberately indifferent." *Estelle*, 429 U.S. at 104. Deliberate indifference to a prisoner's medical needs is defined by the Court as the "unnecessary and wanton infliction of pain." *Id*. Indifference proscribed by the Eighth Amendment may be manifested by a prison

1    doctor's response to the prisoner's need, by the intentional denying or delaying access to medical

2    care, or the intentional interference with treatment once prescribed. *Id.*

3          The court applies an objective test and a subjective test in assessing claims of deliberate

4    indifference. *Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

5    Under the objective test, the plaintiff must show the claimed deliberate indifference of medical

6    personnel is "incompatible with the evolving standards of decency." *Estelle*, 429 U.S. at 103. In

7    prison condition cases such as this, the subjective test requires an "inquiry into a prison official's

8    state of mind when it is claimed that the official has inflicted cruel and unusual punishment.'"

9    *Farmer v. Brennan*, 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Wilson*

10   *v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To satisfy the subjective

11   test, an inmate must establish that prison officials acted "recklessly" by exhibiting "a conscious

12   disregard to a substantial risk of serious harm," given the context of the alleged violation and the

13   constraints facing the officials. *Id.* If one of these components is not established, the court need

14   not inquire as to the existence of the other. *Helling*, 509 U.S. at 35.

15         "[T]o show deliberate indifference, the plaintiff must show that the course of treatment

16   the doctors chose was medically unacceptable under the circumstances and that the defendants

17   chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Hamby v.*

18   *Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (internal quotation marks and citation omitted).

19   "Deliberate indifference is a high legal standard. A showing of medical malpractice or

20   negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment"

21   *Id.* (internal quotation marks and citation omitted). Differences in judgment between an inmate

22   and prison medical personnel regarding appropriate medical diagnosis and treatment are not

23   enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th

1  Cir. 1989).  Further, mere indifference, medical malpractice, or negligence will not support a

2  cause of action under the Eighth Amendment. *Broughton v. Cutter Lab.*, 622 F.2d 458, 460 (9th

3  Cir. 1980).

4    Mr. Warren alleges that his Eighth Amendment rights were violated because defendants

5  generally delayed appropriate treatment for his back injury. Dkt. 9. He also alleges defendants

6  interrupted treatment for his back injury when they transferred him to CRCC and that this

7  resulted in substantial interruption and delay in treatment. *Id.*

8    More specifically he alleges defendants Horn and Gumbo acted with deliberate

9  indifference to his serious medical need when they "refused [him] sickcall care, on 3-12-2019,

10  failed to report a work place injury to labor and industries on 2-20-2019, failed to establish a

11  medical transfer hold blocking the 6-10-2019 transfer to CRCC until surgical repair was

12  completed … and permitting DOC custody personal [sic] to dictate medical decisions regarding

13  plaintiff's health and welfare[.]" He alleges defendant Landis acted with deliberate indifference

14  to his serious medical need when she "refused plaintiff care on 7-17-2019, failed to report a work

15  place injury to labor and industries on 7-17-2019, failed to establish a medical transfer hold

16  blocking the 6-10-2019 transfer to CRCC until surgical repair was completed … and permitting

17  DOC custody personal [sic] to dictate medical decisions regarding plaintiff's health and

18  welfare[.]"

19    **1.  March 12, 2019 Sick Call**

20    Mr. Warren alleges defendants ARNP Gumbo and PA-C Horne violated his Eighth

21  Amendment rights when they refused him sick call on March 12, 2019, and instead directed him

22  to sign up for an appointment with his provider. But the evidence in the record does not support

23  Mr. Warren's claim that defendants acted with deliberate indifference in treating Mr. Warren.

1    As set forth in the declaration of Dr. Sawyer, as well as in Mr. Warren's own medical

2    records, Mr. Warren was seen by non-defendant RN2 Shaw at sick call on March 12, 2019, not

3    by defendants Gumbo or Horne. Dkt. 38; Dkt. 10, at 32 (Amended Complaint, Exh. A). The

4    record further shows that Mr. Warren had seen ARNP Gumbo several days before on March 4,

5    2019, complaining of a back pain "flare" radiating to his right lower leg as well as intermittent

6    numbness. *Id.* On that date he stated that methocarbamol helped him relax and he was advised to

7    continue taking ibuprofen in his cell and also to continue taking methocarbamol for muscle

8    relaxation as needed. *Id.*

9    On March 12, 2019, Mr. Warren signed up for sick call and was seen by RN2 Shaw who

10   is not named as a defendant. Dkt. 10, at 32 (Amended Complaint, Exh. A). RN2 Shaw's

11   treatment note from March 12, 2019 states Mr. Warren was complaining of "ongoing low back

12   and right leg pain and tingling." *Id.* The treatment note further states "provider notified [and]

13   offender is to sign up to see PCP." *Id.* The record shows that Mr. Warren then saw his provider

14   ARNP Gumbo again a few weeks later on March 28, 2019, where he continued to complain of

15   right sciatic pain as well as numbness and tingling. *Id.*, at 33. The note states Mr. Warren was

16   advised to take "ibuprofen, naproxen, Tylenol, ice, heat, rest when possible." *Id.*, at 33.

17   There is no evidence in the record with respect to the March 12, 2019, sick call to

18   indicate that either defendant Horne or Gumbo was aware that Mr. Warren was at a substantial

19   risk of serious harm with respect to his back injury on that date and that they consciously

20   disregarded that risk. The March 12, 2019 treatment note reflects that RN2 Shaw contacted a

21   "provider," but it is unclear whether this "provider" refers to any of the named defendants.

22   Furthermore, even assuming one of these defendants was the provider contacted, there is no

23   evidence in the record as to what precise information was conveyed to the provider. The

treatment note reflects only "ongoing low back pain and right leg pain" not a worsening of

symptoms or any request for additional pain medication. Assuming this was the information

conveyed to the "provider" by RN2 Shaw, in light of the fact that Mr. Warren had previously

been seen and examined by ARNP Gumbo for these same symptoms the previous week it cannot

be said that in directing Mr. Warren to sign up for an appointment to be seen by the provider

shortly thereafter that the provider knew of and disregarded a substantial risk of serious harm to

Mr. Warren. There is no indication in the record, for instance, that Mr. Warren was complaining

at sick call of the acute onset of new symptoms indicating a potential emergent serious medical

need. Mr. Warren also makes no showing that this slight delay in being evaluated in fact placed

him at a substantial risk of serious harm. The Court notes that it appears from the record that Mr.

Warren's complaints, symptoms and treatment remained largely the same between the March 4,

2019, and March 28, 2019 evaluations with ARNP Gumbo.[3]

       Based on the foregoing and viewing the facts in the light most favorable to Mr. Warren,

the undersigned finds that Mr. Warren has failed to raise an issue of material fact as to whether

defendants were deliberately indifferent to his health with respect to the March 12, 2019, sick

call incident. Therefore, the undersigned recommends that defendants are entitled to summary

judgment on this claim.

       **2.**       **Failure to Establish Medical Transfer Hold**

---

[3] The Court notes that the record shows that Mr. Warren did grieve the March 12, 2019, sick call incident. Dkt. 10, at 58. The grievance was initially denied because sick call is intended for "sudden onset health issues" and Mr. Warren had been seen four times previously in the prior several weeks for the same low back and leg pain complaints. *Id.* However, the grievance was upheld in part on appeal based on the conclusion that if Mr. Warren was complaining of some increasing pain related to his ongoing back condition, he should have been seen at sick call on March 12, 2019, rather than being directed to sign up for an appointment. Dkt. 44, at 29-30. The Court notes that while the delay in Mr. Warren's treatment might be considered an error in judgment or, at most, negligence, for the reasons discussed above, there is no evidence to support a claim that in directing Mr. Warren to sign up for an appointment with his provider that defendants acted with deliberate indifference to a serious medical need.

REPORT AND RECOMMENDATION - 24

1    Mr. Warren contends defendants Horne, Gumbo and Landis, violated his rights by failing

2    to establish a medical transfer hold blocking his June 10, 2019, transfer to CRCC until surgical

3    repair was completed.

4    In his declaration, Dr. Sawyer opines that Mr. Warren's back problems and the care he

5    was receiving at MCC-TRU for those problems did not constitute a valid reason to keep Mr.

6    Warren at MCC-TRU as CRCC was fully capable of providing the care Mr. Warren needed for

7    his back problems. Dkt. 38. The record supports Dr. Sawyer's assertion. The record shows Mr.

8    Warren was approved for an MRI on May 31, 2019, but before MCC-TRU scheduled Mr.

9    Warren to be transported to an outside medical facility for an MRI, he was transferred to CRCC

10   on June 13, 2019, based on the decision of the Headquarters Classification Screening Committee

11   (HCSC). The record shows that after arriving at CRCC, health care staff from CRCC arranged

12   for Mr. Warren to get his approved MRI which was done just a few weeks later, on July 3, 2019.

13   Mr. Warren clearly disagrees with the decision to transfer him to CRCC. But he fails to

14   offer any evidence which would indicate that his transfer to another facility placed him at

15   substantial risk of serious harm and that defendants consciously disregarded that risk.[4] Rather,

16   the evidence indicates that Mr. Warren continued to receive appropriate care upon his transfer to

17   CRCC. His MRI was scheduled just a few weeks after his arrival and over the course of the next

18   several months an MRI was conducted and reviewed by two specialist, he was evaluated by the

19   neurosurgeon, scheduled for an echocardiogram and then cleared for and scheduled for surgery.[5]

20

21   [4] Mr. Warren does assert that he was forced to sleep on the floor at another facility during the course of his transfer
     and that the long period of time driving caused him additional back pain. But Mr. Warren fails to demonstrate that
22   the medical personnel defendants were aware of or responsible for the conditions of his confinement during his
     transfer to CRCC.

23   [5] The Court notes that Mr. Warren also mentions that he did not have access to physical therapy at CRCC. However,
     there is minimal evidence in the record regarding the role of physical therapy in the treatment of Mr. Warren's
     condition. Dr. Sawyer's evaluation notes state only that physical therapy "may be helpful at this time, if available."
     Dkt. 38, at 8. And while there is some indication that Mr. Warren did engage in some physical therapy during some

REPORT AND RECOMMENDATION - 25

Based on the foregoing and viewing the facts in the light most favorable to Mr. Warren, the undersigned finds that Mr. Warren has failed to raise an issue of material fact as to whether defendants were deliberately indifferent in failing to establish a medical transfer hold. Therefore, the undersigned recommends that defendants are entitled to summary judgment on this claim.

### 3.   July 17, 2019 Evaluation by Defendant Landis

Mr. Warren also argues that defendant Landis acted with deliberate indifference to his serious medical needs when she "refused plaintiff care on 7-17-2019 […] failed to establish a medical transfer hold blocking the 6-10-2019 transfer to CRCC until surgical repair was completed … and permitting DOC custody personal [sic] to dictate medical decisions regarding plaintiff's health and welfare[.]" Dkt. 9. Again, the record does not support Mr. Warren's assertions.

First, PA-C Landis states in her declaration that she was not involved in the decision to transfer Mr. Warren but she is unaware of any medical reason for him not to be transferred as CRCC was able to provide the same quality of medical care to Mr. Warren for his disc issues as MCC. Dkt. 40. Mr. Warren presents no evidence in response or otherwise indicating that defendant Landis was involved in any way in the decision to transfer him to CRCC.

PA-C Landis further states that she met with Mr. Warren on July 17, 2019, and provided some medical care but that he refused to allow her to conduct a physical examination because

period at MCC-TRU, there is no evidence that physical therapy was mandated, considered necessary to treat his condition, or even to what extent, if any, it was helpful or harmful for Mr. Warren not to have access to physical therapy at the time of his transfer. The Court also notes that at the time Mr. Warren was transferred he had not yet had an MRI and therefore it had not been determined whether or not he would require surgery. There is insufficient evidence in the record to raise a genuine issue of material fact as to whether defendants acted with deliberate indifference in failing to place a medical hold on Mr. Warren to prevent his transfer to a facility which Mr. Warren alleges did not provide physical therapy. The Court also notes that Mr. Warren states in his response to defendants' motion that on approximately July 24, 2019, (shortly after Mr. Warren arrived at CRCC and he was in the process of being evaluated for possible surgery) PA-C Ririe offered to transfer Mr. Warren to Airway Heights Correctional Complex (AHCC) to better accommodate his physical therapy needs after surgery. Dkt. 44, at 10.

REPORT AND RECOMMENDATION - 26

1    she was female and he wanted the examination done by a male for religious reasons. *Id.* PA-C

2    Landis states that she referred Mr. Warren to a male provider, PA-C Ririe who saw Mr. Warren

3    the following week and continued the workup started by PA-C Landis on July 17, 2019. *Id.* PA-

4    C Landis states she does not recall providing any further medical care to Mr. Warren after July

5    17, 2019, once his care was transferred to PA-C Ririe. *Id.* She states that she did not delay or

6    deny any medical care to Mr. Warren and the limited care she did provide was appropriate and

7    consistent with the standard of care in the medical community. *Id.*

8         Mr. Warren appears to take issue with the fact that PA-C Landis wished to perform n

9    physical examination before scheduling him for a neurological consultation or requesting a

10   gabapentin prescription. Mr. Warren does not dispute that he refused to allow PA-C Landis to

11   physically examine him, indicating he wanted a male provider to examine him for religious

12   reasons. The record shows that when Mr. Warren refused the physical examination PA-C Landis

13   scheduled him to be seen by PA-C Ririe the following week. PA-C Ririe continued Mr. Warren's

14   initial workup and presented his case for a neurological consultation shortly thereafter. Dkt. 10,

15   at 76. DOC then approved the neurosurgical evaluation and any treatments recommended as a

16   result of this evaluation shortly after that on July 30, 2019. Dkt. 38.

17        Again, Mr. Warren offers no evidence that this slight delay placed him at a substantial

18   risk of serious harm or that PA-C Landis consciously disregarded such a risk. At best, Mr.

19   Warren's allegations with respect to PA-C Landis amount to a disagreement with his course of

20   treatment, and her opinion that he should be physically examined prior to scheduling outside

21   consultation or requesting new medication. Such disagreement does not amount to deliberate

22   indifference.

23

1    Based on the foregoing and viewing the facts in the light most favorable to Mr. Warren,

2    the undersigned finds that Mr. Warren has failed to raise an issue of material fact as to whether

3    defendant Landis was deliberately indifferent in treating him. Therefore, the undersigned

4    recommends that defendants are entitled to summary judgment on this claim.

5        **4.**    **Mr. Warren's Overall Medical Treatment**

6    As noted above, Dr. Sawyer's declaration sets forth the following opinion

7    regarding Mr. Warren's overall medical treatment for his back condition:

> Based on my experience and training as a medical doctor, it is my opinion that
> Mr. Warren received appropriate and timely care for his back and leg problems
> from February 2019 to the present. Shortly after he complained of back and leg
> pain Mr. Warren's back was X-rayed and these X-rays did not indicate serious
> problems requiring anything more than a conservative, wait-and-see approach as
> most herniated discs resolve themselves within a few weeks or months. Once this
> conservative approach did not produce the desired results, Mr. Warren was
> timely given an MRI which was interpreted by two outside specialists. One of the
> specialists recommended a neurological evaluation and that was also timely
> provided. The Physician who conducted the neurological evaluation
> recommended that Mr. Warren have surgery on his back and that was approved
> by DOC. While Mr. Warren made complaints of pain, DOC's health care
> providers always offered Mr. Warren pain medications and other aids, such as a
> cane and lay-ins from work. Mr. Warren never had such severe pain that he was
> unable to perform his activities of daily living, including ambulating, personal
> hygiene, and eating. In fact, Mr. Warren often refused the pain medications
> offered to him by DOC health care staff. It is noteworthy that when Dr. Heller
> was asked by CRCC medical staff for assistance in arranging the cardiac
> evaluation and clearance Mr. Warren needed prior to surgery, Dr. Heller advised
> CRCC medical staff scheduling the cardiac clearance was not urgent "because
> the surgery itself was not urgent" even with Mr. Warren's level of "discomfort".
> In my opinion the care provided to Mr. Warren for his back problems by DOC
> health care staff was clearly consistent with the standard of care in the medical
> community in Washington.

19    Mr. Warren disagrees with Dr. Sawyer's opinion but for the most part does not

20   substantively dispute Dr. Sawyer's summary of his medical and treatment history. Mr. Warren

21   argues that there were delays in his treatment including in obtaining his MRI and scheduling his

22   surgery but offers no evidence to demonstrate that the short delays were the result of deliberate

23   indifference by the defendants. That is, apart from Mr. Warren's own speculation, he offers no

1  evidence that the relatively short delays in obtaining testing and treatment in fact put him at a

2  substantial risk of serious harm or that defendants were aware of a substantial risk and

3  consciously disregarded that risk.

4      Based on the foregoing and viewing the facts in the light most favorable to Mr. Warren,

5  the undersigned finds that Mr. Warren has failed to raise an issue of material fact as to whether

6  defendants were deliberately indifferent with respect to his medical care.

7      **5.    Failure to Report Injury to Department of Labor and Employment**

8      Mr. Warren alleges defendants Horne, Gumbo and Landis acted with deliberate

9  indifference to his serious medical needs when they "failed to report a work place injury to labor

10  and industries" when they first examined him. Dkt. 9.

11      There is no evidence that defendants were aware that their failure to report Mr. Warren's

12  workplace injury placed Mr. Warren at substantial risk of serious harm (nor has Mr. Warren

13  shown this to be the case) or that they consciously disregarded that risk. As discussed above, the

14  record shows that defendants Horne, Gumbo and Landis were not deliberately indifferent in

15  treating Mr. Warren's medical condition. Even if defendants made an error in failing to report

16  Mr. Warren's injury as a workplace injury to L&I, there is no evidence in the record that they

17  acted with deliberate indifference, as Mr. Warren claims, in doing so.

18      Defendants also argue that pursuant to Wash. Rev. Code § 72.60.100, Mr. Warren is not

19  entitled to Worker's Compensation benefits. Mr. Warren does not specifically respond to

20  defendants' argument on this point. Wash. Rev. Code § 72.60.100 provides:

21          Nothing in this chapter is intended to restore, in whole or in part, the civil
            rights of any inmate. No inmate compensated for work in correctional

22          industries shall be considered as an employee or to be employed by the
            state or the department, nor shall any such inmate, except those provided
            for in RCW 72.60.102 and 72.64.065, come within any of the provisions

23          of the workers' compensation act, or be entitled to any benefits
            thereunder whether on behalf of himself, herself, or of any other person.

Wash. Rev. Code 72.60.102 provides that certain classes of workers (Classes I, II, and IV as defined in Wash. Rev. Code 72.09.100[6]) are entitled to workers compensation benefits with certain conditions. Wash. Rev. Code 72.60.065 provides, in relevant part that "any inmate working in a department of natural resources adult honor camp established and operated pursuant to RCW 72.64.050, 72.64.060, and 72.64.100 shall be eligible for the benefits provided by Title 51 RCW, as now or hereafter amended, relating to industrial insurance[.]"

The record indicates that Mr. Warren was working as a porter within the MCC-TRU facility at the time of his injury. Mr. Warren's position does not appear to fall within the descriptions of the types of workers who would be entitled to worker's compensation benefits pursuant to Wash. Rev. Code Ann. § 72.60.100. *See* Wash. Rev. Code Ann. § 72.09.100. But, even if it did, Mr. Warren has failed to establish that defendants' actions violated the Eighth

---

[6] Wash. Rev. Code § 72.64.065 defines the classes of workers in relevant part as follows:

CLASS I: FREE VENTURE INDUSTRIES.
(a) The employer model industries in this class shall be operated and managed in total or in part by any profit or nonprofit organization pursuant to an agreement between the organization and the department. The organization shall produce goods or services for sale to both the public and private sector.[…]
CLASS II: TAX REDUCTION INDUSTRIES
(a) Industries in this class shall be state-owned and operated enterprises designed primarily to reduce the costs for goods and services for tax-supported agencies and for nonprofit organizations.[…]
CLASS III: INSTITUTIONAL SUPPORT INDUSTRIES.
(a) Industries in this class shall be operated by the department. They shall be designed and managed to accomplish the following objectives:
(i) Whenever possible, to provide basic work training and experience so that the inmate will be able to qualify for better work both within correctional industries and the free community. It is not intended that an inmate's work within this class of industries should be his or her final and total work experience as an inmate […]
(d) *All able and eligible inmates who are assigned work and who are not working in other classes of industries shall work in this class. […]*
CLASS IV: COMMUNITY WORK INDUSTRIES.
(a) Industries in this class shall be operated by the department. They shall be designed and managed to provide services in the inmate's resident community at a reduced cost. The services shall be provided to public agencies, to persons who are poor or infirm, or to nonprofit organizations.
Wash. Rev. Code §72.64.065 (emphasis added).

REPORT AND RECOMMENDATION - 30

1   Amendment, nor has he alleged the violation of any other federal constitutional or statutory right.

2   Accordingly, defendants are entitled to summary judgment on this claim.

3   **B.    Retaliation**

4   Mr. Warren alleges that his transfer to CRCC was done in retaliation for his refusal to

5   participate in SOTAP programming at MCC.

6   When a prisoner alleges retaliation, he must prove five elements: (1) that he was

7   subjected to adverse action; (2) the adverse action was imposed because of certain conduct; (3)

8   the conduct that gave rise to the adverse action is legally protected; (4) the adverse action

9   chilled the prisoner's speech; and (5) the adverse action did not advance a legitimate

10  penological goal. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). Plaintiff must also

11  show that the retaliation was the substantial or motivating factor behind the conduct of the

12  prison official. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Brodheim v. Cry*,

13  584 F.3d 1262, 1271 (9th Cir. 2009). The prisoner must also show his First Amendment rights

14  were actually chilled by the retaliatory action. *Rhodes*, 408 F.3d at 568.

15  Because claims of retaliation are easy for inmates to allege, courts examine such claims

16  with skepticism to avoid interfering too much with prison operations. *See Canell v. Multnomah*

17  *County*, 141 F. Supp. 2d 1046, 1059 (D. Or. 2001) (quoting *Adams v. Rice*, 40 F.3d 72, 74 [4th

18  Cir. 1994]). Furthermore, courts should review prisoner retaliation claims in light of the United

19  States Supreme Court's "disapproval of excessive judicial involvement in day-to-day prison

20  management." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (citing *Sandin*, 515 U.S. at

21  482).

22  The record reflects that Mr. Warren was transferred from MCC to CRCC because he

23  refused to participate in SOTAP programming. Mr. Warren does not deny that he refused to

REPORT AND RECOMMENDATION - 31

1    participate in SOTAP programming but, rather, that defendants' decision to transfer him based

2    on that refusal constituted retaliation. But Mr. Warren does not provide any facts or evidence to

3    demonstrate why his refusal to participate in the SOTAP program was protected conduct under

4    the First Amendment. *See Williams v. Madrid*, No. 1:13-CV-02104-MJS, 2014 WL 1600569, at

5    *2 (E.D. Cal. Apr. 21, 2014), *aff'd*, 609 F. App'x 421 (9th Cir. 2015) (dismissing plaintiff's claim

6    of retaliation against a social worker based on his failure to participate in a group treatment

7    program for failure to state a claim where plaintiff failed to explain "how or why the First

8    Amendment applie[d] to his refusal to participate in the program."). *Williams v. Castaneda*, No.

9    116CV0908MJSPC, 2016 WL 4120326, at *2 (E.D. Cal. Aug. 1, 2016) (dismissing plaintiff's

10   First Amendment retaliation claim "because the conduct that he describes—namely, the exercise

11   of his statutory right to decline participation in certain programs at [the prison]—does not

12   amount to protected conduct under the First Amendment.")

13          Furthermore, defendants present evidence that Mr. Warren was transferred in order to

14   allow other eligible and willing inmates the opportunity to participate in the SOTAP program.

15   According to Counselor Sager, transfers to other facilities of inmates who are ineligible or

16   unwilling to participate in SOTAP at MCC are routinely done for this purpose. Mr. Warren does

17   not dispute this evidence. The record shows that the decision to transfer Mr. Warren to CRCC

18   was based on an appropriate and non-pretextual desire to provide access to programming to other

19   inmates who were eligible and willing to participate in the SOTAP program. The Court notes

20   that a retaliation claim is not plausible if there are "more likely explanations" for the actions.

21   *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).[7] The evidence here shows Mr. Warren's transfer was

22   not retaliatory and advanced legitimate penological interests.

23

---

[7] The Court notes that Mr. Warren does not appear to argue, nor does he present facts or evidence, that defendants transferred him in retaliation for the exercise of his religion at MCC-TRU. Mr. Warren does appear to allege in his

Based on the foregoing and viewing the facts in the light most favorable to Mr. Warren, the undersigned finds that Mr. Warren has failed to raise an issue of material fact as to whether defendants retaliated against him in transferring him to CRCC. the undersigned recommends that defendants' motion for summary judgment be granted as to Mr. Warren's retaliation claims.

**C.      Defendant Stewart– Personal Participation**

In order to state a civil rights claim, a plaintiff must set forth the specific factual basis upon which he claims each defendant is liable. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (1980).  A defendant cannot be held liable under 42 U.S.C. §1983 solely on the basis of supervisory responsibility or position. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965, 967 (9th Cir. 1982). Rather, each defendant must have personally participated in the acts alleged. *Id.* "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss. *Peña v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992).

Mr. Warren names Corrections Program Administrator (CPA) Belinda Stewart as a defendant but fails to allege personal participation in the violation of his constitutional rights.

---

response to the motion that he also filed various grievances at MCC and implies that his transfer was in retaliation for filing those grievances. But Mr. Warren offers no facts or evidence, beyond speculation, to link his grievances to his transfer.

1    Mr. Warren claims, and defendants concede, that CPA Stewart was involved in effectuating his

2    transfer from CRCC to MCC in November 2017, to provide him greater access to religious

3    programming opportunities. Mr. Warren claims he had a "contract" with CPA Stewart related to

4    the 2017 transfer and that the contract was breached when he was transferred back to CRCC.

5    Dkt. 9. But Mr. Warren presents no evidence of a contract. Classification Counselor Sager sets

6    forth in his declaration that he was not aware of any such "contract" and that he had never heard

7    of such a contract being entered into at DOC. Counselor Sager also attests that religious

8    accommodation is not a factor they are directed to consider in making classification decisions.

9    Moreover, as defendants point out, even if there was such a contract, Mr. Warren's allegation

10   that CPA Stewart breached a contract with him does not, without more, allege a constitutional

11   violation.

12          Mr. Warren alleges no specific facts and offers no evidence demonstrating that CPA

13   Stewart was in any way involved in or even aware of his transfer from CRCC to MCC in June

14   2019. Rather, the record reflects that the individuals involved in the classification decision to

15   transfer Mr. Warren did not include CPA Stewart.[8] As such, Mr. Warren fails to demonstrate that

16   CPA Stewart caused or personally participated in causing the harm alleged in the complaint.

17          Accordingly, the undersigned recommends that defendant Stewart be dismissed from this

18   action as she cannot be held liable solely on the basis of her supervisory responsibility or

19   position.

20   **D.      Free Exercise of Religion – First Amendment and RLUIPA**

21

22   _____

23   [8] Counselor Sager states that the individuals involved in the classification decision to transfer Mr. Warren included
     Monqueescha Walker, Counselor Sager, CUS Flick, mental health counselor Jiminez, and Correctional Sergeant
     Kantak as part of the FRMT and Kevin Bowen, Casey Kaech, Shelly Hanson, Donald Feist, Charles Korus, Richard
     Fall, and Kathryn McCann as part of the HCSC. Dkt. 39.

1    Mr. Warren also argues that defendants Stewart, Flick, Sager, Hathaway, and Stewart

2  violated his right to the free exercise of religion. *Id.* He claims by transferring him to CRCC

3  these defendants substantially burdened his ability to adhere to Jewish law and practice his faith.

4  *Id.* He claims at CRCC he is not permitted to exercise his religion "in any form out of four man

5  cell accommodation in a religiously required and or appropriately Orthodox Judaism setting of

6  ritual custom and worship[.]" *Id.* He alleges CRCC "continues to refuse and or deny re-

7  institution of Judaism religious service accommodation under unsponsored condition[.]" *Id.*

8  The Court analyzes this claim as alleging violations under the First Amendment's freedom of

9  religion clause and the Religious Land Use and Institutionalized Persons Act (RLUIPA).

10    To the extent Mr. Warren is arguing that defendants' actions violated his First

11  Amendment right to practice his religion, he "must show that [defendant] burdened the practice

12  of [his] religion, by preventing [him] from engaging in conduct mandated by [his] faith, without

13  any justification reasonably related to legitimate penological interests." *Freeman v. Arpaio*, 125

14  F.3d 732, 735 (9th Cir. 1997) (citing *Turner v. Safley*, 482 U.S. 78, 89 [1987] (footnote

15  omitted)). "In order to reach the level of a constitutional violation, the interference with one's

16  practice of religion 'must be more than an inconvenience; the burden must be substantial and an

17  interference with a tenet or belief that is central to religious doctrine.'" *Freeman*, 125 F.3d at 737

18  (citing *Graham v. C.I.R.*, 822 F.2d 844, 851 [9th Cir. 1987]).

19    A "substantial burden" is one that "put[s] substantial pressure on an adherent to modify

20  his behavior and to violate his beliefs," *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450

21  U.S. 707, 718 (1981), or one that forces a person to "choose between following the precepts of

22  her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the

23  precepts of her religion ... on the other hand," *Sherbert v. Verner,* 374 U.S. 398 (1963).

1    "[I]ncidental effects of government programs, which may make it more difficult to practice

2    certain religions but which have no tendency to coerce individuals into acting contrary to their

3    religious beliefs" are insufficient to state a claim under Free Exercise Clause. *Lyng v. Northwest*

4    *Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)

5        "The right to exercise religious practices and beliefs does not terminate at the prison

6    door[,]" *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir. 1987) (citing *O'Lone v. Estate of*

7    *Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)), but a prisoner's right to

8    free exercise of religion "is necessarily limited by the fact of incarceration," *Ward v. Walsh,* 1

9    F.3d 873, 876 (9th Cir. 1993) (citing *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400). A restriction on

10    an inmate's First Amendment religious rights is valid if it is reasonably related to legitimate

11    penological interests. *See O'Lone,* 482 U.S. at 349 (*quoting Turner v. Safley*, 482 U.S. 78, 89,

12    107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

13        In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act

14    (RLUIPA), which provided heightened protection of religious beliefs to prevent undue barriers

15    to religious observances by persons institutionalized in state or federal institutions. Under

16    RLUIPA, no government "shall impose a substantial burden on the religious exercise of a person

17    residing or confined to [a jail, prison or other correctional facility] ... even if the burden results

18    from a rule of general applicability," unless the burden furthers a "compelling governmental

19    interest" and is the "least restrictive means of furthering that compelling governmental interest."

20    42 U.S.C. § 2000cc–1(a).

21        Here, Mr. Warren has failed to establish that any of the named defendants' actions

22    violated his rights under the First Amendment or RLUIPA. Mr. Warren's complaints about his

23    access to religious accommodation and programming are all related to his confinement at CRCC.

1    The only defendant employed at CRCC is defendant Landis who is a physician's assistant whom

2    Mr. Warren does not allege is in any way responsible for the alleged lack of religious

3    programming at CRCC.

4    As noted above, there is no evidence defendant Stewart was involved in or aware of Mr.

5    Warren's transfer to CRCC, or that she was involved in any way in his access (or lack thereof) to

6    religious programming at CRCC once he returned to the facility in June 2019. The remaining

7    defendants are all employees at MCC-TRU whom Mr. Warren does not allege are in any way

8    responsible for the alleged lack of religious programming at CRCC. In sum, Mr. Warren fails to

9    establish any of the named defendants personally participated in, or were the proximate cause of,

10    the alleged violation of his First Amendment or RLUIPA rights. Accordingly, defendants are

11    entitled to summary judgment on Mr. Warren's First Amendment and RLUIPA claims as well.

12    **E.    Equal Protection**

13    Prisoners enjoy religious freedom and equal protection of the law subject to restrictions

14    and limitations necessitated by legitimate penological interests. *Bell v. Wolfish,* 441 U.S. 520,

15    545-46, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Equal Protection Clause requires the State to

16    treat all similarly situated people equally, and ensures that prison officials cannot discriminate

17    against particular religions. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439,

18    105 S.Ct. 3249, 87 L.Ed. 2d 313 (1985). Specifically, the Equal Protection Clause entitles each

19    prisoner, including a prisoner who is an adherent of a minority religion, to "a reasonable

20    opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who

21    adhere to conventional religious precepts." *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31

22    L.Ed.2d 263 (1972) (per curiam) (Buddhist prisoners must be given opportunity to pursue faith

23    comparable to that given Christian prisoners). Although prisoners are entitled to equal protection,

1   it does not follow that a prison must duplicate every religious benefit it provides so that all

2   religions are treated exactly the same. Prisons need not provide identical facilities or personnel to

3   different faiths, but must make a "good faith accommodations of the prisoner's rights in light of

4   practical considerations." *Allen v. Toombs,* 827 F.2d 563, 569 (9th Cir. 1987).

5       To prevail on an equal protection claim under § 1983, a plaintiff must show that "the

6   defendants, acting under color of state law, discriminated against [the plaintiff or plaintiffs] as

7   members of an identifiable class and that the discrimination was intentional." *Flores v. Morgan*

8   *Hill Unitied School Dist.,* 324 F.3d 1130, 1134 (9th Cir. 2003). "Beyond this requirement of

9   showing intentional discrimination ... there is no specific test that an equal protection plaintiff is

10  required to meet, and in order to survive a motion for summary judgment by the defendant, a

11  plaintiff must only produce evidence sufficient to establish a genuine issue of fact as to the

12  defendant's motivations." *FDIC v. Henderson,* 940 F.2d 465, 471 (9th Cir. 1992).

13      Mr. Warren alleges that defendants discriminated against him by transferring him to

14  CRCC. To the extent Mr. Warren is attempting to claim an equal protection violation, he has

15  failed to do so. The record reflects that defendants did not transfer Mr. Warren because he was

16  an Orthodox Jew but because he refused to participate in the SOTAP program. The record

17  reflects that Mr. Warren was not transferred for discriminatory purposes but, rather, in order to

18  provide access to the SOTAP program for inmates who were eligible and willing to participate.

19  There is no evidence that in transferring Mr. Warren he was treated any differently than other

20  similarly situated inmates. Rather, Counselor Sager's declaration states that classification

21  officials routinely transfer inmates out of MCC-TRU who are not eligible and willing to

22  participate in SOTAP to provide access to those inmates who are. Counselor Sager also states

23

1    that he inquired of MCC-TRU chaplain whether there was any religious reason that Mr. Warren

2    needed to remain at MCC-TRU and was told there was not.

3       These facts do not establish an equal protection violation. Mr. Warren fails to provide

4    evidence sufficient to raise a genuine issue of material fact as to the motivations of any of the

5    defendants; *i.e.*, there is no evidence that any of the defendants acted with intent to discriminate

6    when they determined that he should be transferred to CRCC.

7       Mr. Warren also argues that defendants Horne, Gumbo, and Landis violated his rights to

8    equal protection with respect to his medical treatment and in failing to place a medical transfer

9    hold. But there is no evidence in the record that Mr. Warren was treated medically any different

10   from other similarly situated inmates or that defendants' treatment of Mr. Warren was in any

11   way motivated by his race, religion or any other protected status.

12      Accordingly, defendants are entitled to summary judgment on Mr. Warren's equal

13   protection claims.

14   **F.    Conspiracy**

15      Mr. Warren also contends that the defendants engaged in a conspiracy to violate his

16   constitutional rights.

17      "'A civil conspiracy is a combination of two or more persons who, by some concerted

18   action, intend to accomplish some unlawful objective for the purpose of harming another which

19   results in damage.'" *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (citation

20   omitted). A conspiracy is not itself a constitutional tort under 42 U.S.C. § 1983, but may

21   "enlarge the pool of responsible defendants by demonstrating their causal connections to the

22   violation." *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc). Conclusory

23   allegations of a conspiracy, unsupported by any material facts, are insufficient to state a claim.

1    *See Simmons v. Sacramento County Superior Court*, 318 F.3d 1156, 1161 (9th Cir. 2003);

2    *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989).

3          Here, the record is devoid of any specific facts or evidence to support Mr. Warren's

4    conclusory conspiracy claim. Accordingly, defendants are entitled to summary judgment on this

5    claim.

6    **G.    Official Capacity Claims**

7          To the extent Mr. Warren brings claims against the defendants in their official capacities,

8    as well as their individual capacities, those claims also fail. An official capacity claim must be

9    treated as a claim against the state. In an official-capacity suit, the plaintiff must demonstrate that

10   a policy or custom of the governmental entity of which the official is an agent was the moving

11   force behind the violation. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Graham*, 473 U.S. at 166.

12   A state can be liable under § 1983 only "when execution of a government's policy or custom,

13   whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

14   official policy, inflicts the injury." *Monell,* 436 U.S. at 693; *Hafer*, 502 U.S. 21, 25 (quotation

15   marks and citation omitted) ("Because the real party in interest in an official-capacity suit is the

16   governmental entity and not the named official, the entity's 'policy or custom' must have played

17   a part in the violation of federal law." (some quotation marks omitted)).

18         Mr. Warren fails to submit evidence establishing that the defendants took any action

19   pursuant to government policy or custom that violated his constitutional rights.

20   **H.    Qualified Immunity**

21         Defendants also argue that they are entitled to qualified immunity. In *Saucier v. Katz*, 533

22   U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court mandated a two-step

23   sequential process for resolving such claims.  First, courts consider the threshold question:

REPORT AND RECOMMENDATION - 40

"Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201 ("In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established."). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* In *Pearson v. Callahan*, 553 U.S. 223, 235-236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009), the Court receded from *Saucier*, holding "that the *Saucier* protocol should not be regarded as mandatory in all cases," but instead judges should exercise their sound discretion as to which of the two prongs of the analysis to address first. *Id.* In *Pearson*, the Court determined that the officers in that case were entitled to qualified immunity "on the ground that it was not clearly established at the time of the search that their conduct was unconstitutional," without first deciding whether the facts shown by the plaintiff constituted a violation of a constitutional right. *Id.*

Mr. Warren has not shown a constitutional violation. Therefore, the Court's inquiry ends and it need not address whether defendants would otherwise be entitled to qualified immunity.

**G.   State Law Claims**

Mr. Warren also attempts to raise various state law claims including allegations of medical negligence.

A district court has discretion over whether to exercise supplemental jurisdiction over state law claims arising from the same set of operative facts that supports a federal claim. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639-40 (2009) (citing 28 U.S.C. §§ 1367(a), (c)). Ordinarily, when a district court dismisses "all claims independently qualifying for the

exercise of federal jurisdiction," it will dismiss all related state claims, as well. *Artis v. District of Columbia*, 138 S.Ct. 594 (2018) (citing 28 U.S.C. § 1367(c)) (2018); *see also Carlsbad Tech.*, 556 U.S. at 639-40; *see Acri v. Varian Assocs., Inc.,* 114 F.3d 999, 1001 n. 3 (9th Cir.1997) (suggesting that a district court may, but need not, decide sua sponte whether to continue exercising supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) once all federal law claims have been dismissed).

Although the court is not required to dismiss the supplemental state law claims, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, fairness, convenience, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Because the Court is recommending dismissal of all of Mr. Warren's federal claims, the Court also recommends declining supplemental jurisdiction over Mr. Warren's state law claims. Accordingly, the Court recommends Mr. Warren's supplemental state law claims be dismissed without prejudice upon dismissal of his federal claims on the same facts. *See Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 509 (9th Cir. 1989).

## CONCLUSION

The undersigned recommends that defendants' motion for summary judgment (Dkt. 37) be GRANTED and that Mr. Warren's federal claims be DISMISSED WITH PREJUDICE as described above. The undersigned further recommends that the Court decline to exercise supplemental jurisdiction over Mr. Warren's state law claims and that those claims be DISMISSED WITHOUT PREJUDICE.

## OBJECTIONS AND APPEAL

1     This Report and Recommendation is not an appealable order. Therefore a notice of

2 appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

3 assigned District Judge enters a judgment in the case.

4     Objections, however, may be filed and served upon all parties no later than **August 6,**

5 **2020.** The Clerk should note the matter for **August 14, 2020**, as ready for the District Judge's

6 consideration if no objection is filed. If objections are filed, any response is due within 14 days

7 after being served with the objections. A party filing an objection must note the matter for the

8 Court's consideration 14 days from the date the objection is filed and served. The matter will

9 then be ready for the Court's consideration on the date the response is due. Objections and

10 responses shall not exceed **eight (8)** pages. The failure to timely object may affect the right to

11 appeal.

12     DATED this 23rd day of July, 2020.

13

14     _____

15     BRIAN A. TSUCHIDA
       United States Magistrate Judge

16

17

18

19

20

21

22

23